**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SCOTT ALLEN BOLGER,<br><br>Defendant. | Case No. 1:26-CR-8<br><br>Sentencing: June 3, 2026 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, by undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or the "Guidelines"), hereby files this position of the United States with respect to the sentencing of defendant Scott Allen Bolger (hereinafter "the defendant"). The defendant comes before the Court after pleading guilty to one count of making interstate threatening communications, in violation of 18 U.S.C. § 875(c). In December 2025, the defendant conducted research on Victim-1, a public official, obtaining personal identifiers and private contact information of the victim. The defendant then, using an application to obfuscate his identity, called the victim and later sent a text message threatening Victim-1 with a bullet in the head, prompting law enforcement to respond. During the investigation into that threat, authorities uncovered years' long harassment and intimidation of a second victim using similar and more pervasive tactics. The defendant, showing no remorse, lied to multiple law enforcement entities when confronted and took steps to delete evidence to avoid detection. He now appears before this Court to be sentenced.

The government agrees with the Presentence Investigation Report's ("PSR") calculation of the Guidelines, which result in a sentencing range of 18 to 24 months of incarceration, after

1

acceptance of responsibility (Criminal History Category I, Total Offense Level 15). *See* PSR. ECF. No. 59 ¶¶ 69, 70. For the reasons set forth below, the United States respectfully submits that a sentence of 24 months' incarceration followed by 3 years of supervised release, with special conditions, is consistent with the factors set forth in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to deter the defendant from future illicit activity.

## BACKGROUND

### A. Case Overview

On December 23, 2025, the Federal Bureau of Investigation (FBI) was notified that Vicrtim-1, a public official appointed by the President, received a text message, included below, from an unknown number containing a directed threat of violence.

Shortly before receiving the message, Victim-1 received a phone call from an unknown individual, later identified as the defendant. Immediately after receiving the message, Victim-1 reported the threat to the FBI. Through a quick investigation that spanned through multiple holidays, the FBI uncovered the defendant was the originator of the message.

On December 24, 2025, federal agents sought to interview the defendant at his identified address. When federal agents approached the defendant and identified themselves, the defendant provided the agents with a false name and claimed to not know anyone named "Scott Bolger." The defendant was identified after additional investigation.

Shortly thereafter, the defendant was interviewed by investigators, and the defendant confessed to making the phone call and sending the threatening message to Victim-1. The defendant further confessed to researching Victim-1 online prior to sending the threatening message and used an application to contact Victim-1 to obfuscate his identity. During that same interview, the defendant confessed to sending additional harassing messages to a former roommate in the past. Following the interview, and after the defendant knew there was an ongoing investigation into the matter, the defendant deleted materials relevant to the investigation. The defendant was arrested on December 26, 2025. Following his arrest, investigators reviewed the contents of the defendant's phone. Additionally, during their investigation, they discovered the defendant's prior partner, Victim-2, had reported harassment and threats from the defendant in several police reports.

Investigators later learned that the defendant had been in a relationship with Victim-2 beginning around 2020 and ending in May 2021, following an altercation where Victim-2 reported the defendant hit her. Victim-2 told investigators that the defendant physically, emotionally, and verbally abused her throughout their relationship. Beginning in or around the end of 2022, Victim-2 began being harassed online through social media accounts and phone messages. These messages contained physical threats, intimidation, and insulting language. Among the messages and public posts were insults relating to the victim's education, medical conditions, physical appearance, and other threatening language. In 2023, Victim-2 began receiving direct messages by additional profiles and emails from accounts such as "stillherebitch@proton.me." These messages included additional derogatory remarks and images of Victim-2 in a state of undress. These images, which Victim-2 sent the defendant while dating, were sent with threatening text. The defendant later

posted at least one of these images on a public facing social media account. This activity continued for years through 2024.

Investigators reviewed at least 13 fictious social media accounts believed to have been specifically created by the defendant to harass Victim-2. Many of the accounts were created with profiles that referenced Victim-2's name or other identifiers. The defendant also tracked down Victim-2's email information to continue to harass Victim-2, after Victim-2 reported the harassment to the police. The defendant's phone showed that the defendant was researching Victim-2 through at least November 2025, over four years after their separation. When questioned by local authorities about the profiles and persistent harassment, the defendant falsely denied any part in the online activity. Victim-2 has suffered financial, personal, emotional, and medical burdens from the defendant's actions.

**B. Procedural History**

On December 26, 2025, United States Magistrate Judge Lindsey R. Vaala issued a criminal complaint and arrest warrant charging the defendant with making interstate threatening communications, in violation of 18 U.S.C. § 875(c), and making materially false statements to a federal agent, in violation of 18 U.S.C. § 1001(a)(2). ECF Nos. 1, 7. On December 26, 2025, the defendant was arrested, and on December 29, 2025, he made his initial appearance before the Honorable William E. Fitzpatrick. ECF Nos. 8, 9. On December 30, 2025, the defendant was ordered detained pending trial, following a finding by the court that he posed a danger to the community. ECF Nos. 15, 16. On January 5, 2026, the defendant filed his motion to revoke the detention order. ECF No. 20. On January 6, 2026, the Honorable Leonie M. Brinkema upheld the detention order, finding the defendant posed a danger to the community. ECF No. 22, 23. On January 16, 2026, the defendant filed a notice of appeal of that decision to the Fourth Circuit,

which later unanimously upheld Judge Brinkema's ruling. ECF No. 24, 57. On January 15, 2026, a grand jury indicted the defendant on one count of making interstate threatening communications, in violation of 18 U.S.C. § 875(c), and he had his arraignment before the Honorable Anthony J. Trenga on January 22, 2026. ECF Nos. 25, 34. On February 26, 2026, the defendant pled guilty to the one-count indictment and is scheduled to be sentenced on June 3, 2026. ECF No. 53-56.

### C. Defendant's Relevant Background and Criminal History

While the defendant has no known criminal history, he has a troubling and lengthy history of harassing, threatening, and reportedly violent behavior. As described further above and below, the defendant has harassed and threatened multiple people, spanning several years. Victim-2 reported that the defendant was violent with her on at least one occasion, and investigators reviewed a message sent by the defendant, which he stated he "thought about beating his [roommate's] face in." The conduct uncovered throughout the investigation also shows that the defendant has specialized skills in technology to further virtual threats and harassment and to obfuscate his illicit activity, making him a dangerous and sophisticated risk.

### ANALYSIS

As the Court is aware, although the Supreme Court rendered the Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing" and should "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." 543 U.S. 220, 264 (2005); *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). After considering the Guidelines and their relevant factors, the Court should also consider "those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The Court must "make an individualized assessment based on the

facts presented" to determine the appropriate sentence. *United States v. Smalls*, 720 F.3d 193, 198 (4th Cir. 2013) (quoting *Gall*, 552 U.S. at 50). Ultimately, the sentence imposed must be reasonable given the § 3553(a) factors and Guidelines. *See Booker*, 543 U.S. at 260-61.

As noted above, the defendant has pleaded guilty to one count of making interstate threatening communications, in violation of 18 U.S.C. § 875(c). The maximum penalties for this offense are 5 years of imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment. *See* 18 U.S.C. § 875(c); 18 U.S.C. §§ 3583(b)(2), 3571(b)(3), 3559(a)(4), and 3013(a)(2)(A).

In this case, and for the reasons stated in Section B below, the United States seeks a within-guidelines sentence of 24 months' incarceration followed by a 3-year term of supervised release with special conditions.

**A. Sentencing Guidelines**

**i. Offense Level Computation**

The base offense level for the defendant's conviction under 18 U.S.C. § 875 is 12. *See* U.S.S.G. § 2A6.1(a)(1). This offence level is increased by 6 levels because Victim-1 was a current and formal public official at the time of the offense, and the defendant was motivated by such status. *See* U.S.S.G. § 3A1.2(a) & (b). The defendant is entitled to a 2-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a). Because the defendant notified the government of his intent to plea in a timely fashion, and pursuant to U.S.S.G. § 3E1.1(b), the defendant receives a further 1-level reduction. This brings the total offense level to 15.

**ii. Defense Objections**

The defendant has several objections to the correctly calculated Guidelines that contort and run counter to rules set forth by the Sentencing Commission, including rules and policy statements

that were added for cases with fact patterns such as the one in this case. The defendant first argues that a 6-level increase should not apply under U.S.S.G. § 3A1.2, claiming Victim-1 is not a public official or government employee and that the defendant was not motivated by such status, even if Victim-1 is found to be a public official. This is inaccurate, and the 6-level increase should apply. Victim-1 is a well-known public official who has held senior government roles in multiple presidential administrations. As the PSR accurately lays out, Victim-1 was a current and former government official at the time the defendant sent the threatening communication. The defendant targeted Victim-1 because of his role as President of the Trump Kennedy Center, according to the defendant's own words to the FBI. The defendant also targeted him because of his work within the Trump Administration, as evident by his words, including "loyalist pig." The defendant's own actions and words in this case dispute his ex-post facto, self-serving claim that he was not motivated by such status.

The Trump Kennedy Center is a national monument whose building is administered by the National Park Service, part of the Department of the Interior. It is also a bureau within the Smithsonian Institution. Congress funds the building, its security, and administrative overhead. Most recently, Congress appropriated $256 Million for renovations of the Trump Kennedy Center in the One Big Beautiful Bill Act of 2025. Title VI, Section 60025, of the Act. The Board of Trustees is governed by statute. *See* 20 U.S.C. § 76h-s. The statute specifies that the following federal officials are board members: the Vice President of the United States; the Secretary of state; the Secretary of Education; the Secretary of Health and Human Services, and the Secretary of the Interior; certain leading members of Congress, and other government officials. Of the 36 additional general Board Members, the President of the United States appoints 24. Victim-1 was appointed as President and Executive Director of the Trump Kennedy Center by President Donald Trump as

part of Trump's role as Chairman of the Board of the Trump Kennedy Center. Public reporting indicates that Victim-1's position is one under and responsible to the President of the United States. Washinton Post, March 16, 2025; *see also Washington Post*, Feb. 12, 2025, "New Kennedy Center Board Elects Trump Chair, fired Rutter as president," by Travis Andrews., et al. In the latter article, it was also reported that the Board of Trustees of the Kennedy Center includes the following: White House Chief of Staff Susan Wiles; Usha Vance (wife of the Vice President); Sergio Gor, White House Personnel Director, among others.

Programming at the Kennedy Center is funded by ticket sales, private donations, corporate partnerships and other sources. So, even though there is a hybrid aspect to the Kennedy Center involving private funding, it is clearly a creature of federal statute and federal control. Moreover, Victim-1, a former Ambassador the Germany and an Ambassador at Large, was closely associated with the President and his Administration and was a public official in his capacity as President of the Trump Kenedy Center. Additionally, in President Trump's first term, Victim-1 served as the acting Director of National Intelligence. At the end of 2024, Victim-1 was appointed as the Special Presidential Envoy for Special Missions by President Trump. It is abundantly clear that Bolger was motivated to threaten Victim-1 due to his status as a public official under President Trump. There is, indeed, no other explanation. The two had no personal relationship. There was no motive other than the political one linked to Victim-1's positions and official actions in the Administration. The enhancement was added to account for and punish the very conduct in this case; it should apply.

The defendant also argues that the 4-level reduction under U.S.S.G. § 2A6.1(b)(6) should apply. This is misguided and another attempt to minimize the defendant's conduct in this case. The defendant took several deliberative steps in generating and delivering his threat to Victim-1. The

8

defendant attempts to articulate his threat as an impromptu message that was made in the heat of the moment. This is simply not true. As previously highlighted, the defendant conducted research about the victim, created accounts to obfuscate his identity, and called Victim-1 prior to sending the threat to ensure it would be delivered to the intended victim. He then covered it up by deleting the message and lying to law enforcement. Each one of these actions requires time and deliberation, and this conduct goes far beyond a single impulse. In his position paper, the defendant, through counsel, articulates this sequence of encounters as the defendant calling "one of its board members to vent," which is an unserious attempt to minimize the disturbing conduct into a legitimate protest. He further states that his call had nothing to do with the threat, which directly contradicts the defendant's own statements during his interview with investigators. The defendant told investigators that he called Victim-1 to verify that the number he found online was actually Victim-1's number. The defendant's deliberation was clear, and any eleventh-hour articulation of a different narrative is a convenient way to mold facts to get an undeserved sentencing reduction. The 4-level reduction should not apply in this case.

Lastly, the defendant argues that he is further eligible for a 0-point offender reduction of 2 levels, despite the Guidelines making it clear that those who make credible threats are ineligible for this reduction. This point lacks credibility as well. The defendant took several steps to make his threat credible to Victim-1, law enforcement, and any reasonable person looking at this case. He researched his victim, found his personal phone number, called him directly prior to making the threat, and sent the threat directly to his personal number. The threat itself also included a location where Victim-1 frequented and had a specific violent action noted – a bullet to the head. These facts are also very different than a threatening post to a mass audience on social media, or a letter sent to a publicly known government building. This threat was private and delivered.

Additionally, the government certainly found the threat credible. Agents were immediately dispatched and continued to investigate during the holidays. Simply because the response and mitigation occurred swiftly does not negate the credible nature of the threat. In the present political atmosphere, acts of violence for political purposes are prevalent, requiring swift action. The victim also found the threat credible, as indicated by his prompt reporting to law enforcement. Lastly, the defendant seems to claim that only those that make multiple threats are ineligible for this reduction. There are other enhancements for multiple threats, which the Guidelines section here does not cite, nor reference. The theory put forth by the defendant would go against the policy implications this provision is intending to enforce. The premise that an offender can credibly threaten to shoot a victim in the head once is fine by this section, but if he says it twice, then he should be ineligible is ludicrous. Accordingly, the defendant is ineligible for this reduction, and the PSR correctly does not apply it.

### iii. Criminal History and Guidelines

The defendant has 0 points for his criminal history, putting him in Criminal History Category I. *See* U.S.S.G. §§ 4A1.1 & 5A. An offense level of 15 and a Criminal History Category I results in a Guidelines range of 18 to 24 months. *Id.*

### B. Section 3553(a) Factors and Recommendation

As the Court is aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson v. United States*, 555 U.S. at 351 (2009); *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for

the sentence imposed to, among other things, reflect the seriousness of the offense, adequately deter criminal conduct, and protect the public from further crimes of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Guidelines for this defendant and this offense; (5) applicable policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. As explained below, based on those factors, a sentence of 24 months' incarceration with 3 years' supervision is warranted, appropriate, and reasonable in this case.

Regarding the first factor, the defendant's history and characteristics reflect the need for a sentence at the higher end of the Guidelines range. The defendant's conduct, as outlined, reflects an escalating pattern of intimidation, threats, and alleged violence that pose a serious danger to his victims and the community. His threat to Victim-1 was targeted, credible, and intended to affect the victim who was acting in his government position. His years-long harassment of a former intimate partner—including repeated threats, online stalking, and non-consensual posting of indecent materials—demonstrates a sustained willingness to inflict fear and humiliation on others. It is clear from the defendant's conduct that he fixates on individuals and obsesses with victimizing them when they are in focus. These circumstances, coupled with his persistent disregard for boundaries and warnings over several years, weigh heavily toward a significant custodial sentence. Victim-2 repeatedly asked the defendant to stop contacting and threatening her. The defendant showed no remorse and continued to harass her for years. He created more profiles and posted more derogatory comments about her using the cloak of the internet. Several of the profiles the defendant created appeared in Victim-2's true name and posted derogatory remarks such as "bald goober" or "follow me if you like bald narcissists. I want to be an influencer, but m'bald and m'fat.

Fleeced by Spanish niggas." In other profiles, the defendant publicly messaged Victim-2 trying to provoke a response, including "come fight."

The defendant has proven he is knowledgeable and technologically savvy. More concerning, he has shown that he can utilize the internet and various online means to obfuscate detection and cover up his activity. Investigators uncovered many fictious email addresses, names, phone numbers, and other identifiers the defendant had operated. This, combined with his fixations, demonstrates the defendant poses a significant risk to the public. Of additional concern, a repeated theme throughout the investigation were antisemitic or other ethnically-charged references. The defendant created a profile with the user "jewpretender," made comments on twitter about Victim-2 representing as Jewish, and called Victim-1 a "pig skin pussy." The defendant's history and characteristics exemplify a need for a significant penalty.

As for the second factor, a 24-month sentence is necessary to protect the community, deter future criminality, and demonstrate the seriousness of the offense. At a time of increased political violence, threats against public officials must be taken seriously and appropriately punished. A light sentence or one that could be perceived as a mere "slap on the wrist" would send precisely the wrong message to the public and this defendant. Not only do public officials have a right to conduct their duties absent from violence or threats thereof, but it is also essential for governmental functions that they not be impeded by such threats. These threats cause significant emotional harm on victims, cost the government resources in responding and adequately securing the official's safety, and overall degrade the government's ability to operate. As such, the penalty for these threats must be severe to deter this conduct. The defendant's threat to Victim-1 was not idle venting; it was targeted and credible causing real fear and a significant government response.

Additionally, it is well-settled that "lack of remorse is a fact that a district court can

12

consider in its evaluation of the § 3553(a) factors." *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090–91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)). It is particularly troubling in this case that the defendant has not shown much remorse for his actions, particularly in relation to Victim-2. Just as he lied to local police when they questioned him about these incidents, he told federal investigators on December 24, 2025 that his 2023 incidents involved "nothing threatening," which is a categorical lie.

On multiple occasions, the defendant, his defense counsel, and letters written in support of the defendant have chalked the defendant's threatening message to Victim-1 up to a bad night that was overcome by emotions. While the defendant's activity is clearly partially driven by emotion, this is not an accurate description of the egregious conduct in this case. What was initially reported as an isolated threat on a public official turned out to show the defendant had threatened and harassed multiple victims over several years. The articulation that the defendant's illicit behavior was caused by a childhood bond to the Trump Kenedy Center and limited to that reflex is also inaccurate. The most disturbing activity uncovered throughout this investigation includes the defendant's actions towards his prior partner, Victim-2. The defendant stalked and tormented Victim-2 for years, dating back to at least 2022. Victim-2 had to live with her private images and information posted on the internet by the defendant for the public to view. Something that cannot be undone. Victim-2 was left with hopelessly trying to contact multiple companies to get these fictious profiles removed or accounts suspended, causing a great resource burden, reputational harm, and stress. Victim-2 changed contact information multiple times, yet the defendant

13

continued to track her down. Lastly, Victim-2 expressed the emotional and mental toll that the defendant's prolonged and disturbing conduct on her. This conduct cannot be allowed, nor punished with a light sentence.

A substantial sentence is necessary to reflect this seriousness and to reinforce that threats and online harassment are not lesser offenses. It is also essential to deter both this defendant and others who might consider using anonymity and technology to intimidate or harm. Protection of the public strongly supports a meaningful period of incarceration given the defendant's history of escalation and retaliation. Anything less would risk further harm to the victims and the broader community.

The third factor asks the Court to look at the types of sentences available. Here, the United States believes that a significant term of 24 months of incarceration is appropriate because the defendant needs to be adequately deterred from future illicit conduct, and without sufficient deterrence and punishment, he poses a significant danger to the community. Multiple independent judicial reviewers of the facts in this case have concluded that the defendant poses a danger to the community. A period of significant incarceration must be imposed to protect the community and allow the defendant time to adequately reflect and develop into a productive member of society.

In addition to a significant term of incarceration, a term of supervision with the special condition that the defendant does not contact and stays away from the victims in this case is necessary and appropriate in this case. The defendant should also be placed on monitoring software and face restrictions on social media. The defendant has repeatedly used social media, the internet, and phones for wrongdoing and to torment members of the community. An added level of deterrence through supervision, and the additional penalties for violations, is both appropriate and necessary in this case.

14

The fourth and fifth factors ask the Court to consider the Guidelines and applicable policy statements. The applicable policy statements emphasize the heightened seriousness of offenses involving threats to public officials and the use of technology to facilitate harassment or exploitation. They further recognize that crimes involving repeated conduct, sustained patterns of intimidation, and the infliction of significant psychological harm warrant substantial custodial sentences. It is worth noting that the defendant escaped several enhancements, including destruction of evidence, multiple threats, and specialized skills, all of which would significantly increase his Guidelines range. When looking at the entire conduct in this case, and considering the policy statements behind these enhancements, the defendant's just barely escapes this. The United States submits that a 24-month sentence is appropriate because it is within the Guidelines calculation, and the policy goals of the Guidelines support a high-end sentence.

The sixth factor looks at sentencing disparities. Here, because a 24-month sentence is within the Guidelines range, there are unlikely to be unwarranted sentencing disparities between the defendant and others similarly situated. Additionally, unlike most cases that involve threats against public officials, this case is significant and unique in many ways. In previous fillings, the defendant has cited cases that involve similar violations. As the government has outlined in responses to those filings, this case involves more sophistication in the ways the defendant has tried to obfuscate his identity, a greater number of victims, and more aggressive and deeply personal forms of harassment and threats. The defendant stalked, harassed, threatened, and humiliated a second victim for over four years prior to sending his threatening message to the public official. None of the cases the defense cites are comparable. A meaningful sentence here would align with the Guidelines to ensure consistency across defendants whose conduct involves comparable risks and harms.

Finally, the seventh factor looks at restitution, which is inapplicable in this case.[1]

In sum, all six of the applicable § 3553(a) factors favor a higher-end sentence in this case. The defendant needs to be adequately deterred and punished for his conduct that poses a significant danger to the community.

### CONCLUSION

Based on the defendant's calculated, malicious, and threatening conduct; his acceptance of responsibility; and the applicable Guidelines range for imprisonment, and after due consideration of the sentencing factors under Section 3553(a), the United States recommends the defendant be sentenced to 24 months' incarceration followed by 3 years of supervised release, with special conditions previously outlined.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

_____/s/_____
Jacob A. Mercer
Russell L. Carlberg
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3780
Fax:    (703) 299-3980
Email: Jacob.Mercer@usdoj.gov

---

[1] While the victims in this case faced loses directly attributable to the defendant's conduct, no restitution was sought, despite the government inquiring.

16

## CERTIFICATE OF SERVICE

I certify that on May 27, 2026, I electronically filed a copy of the foregoing with the Clerk

of the Court using the CM/ECF system, which will send a notification of such filing to all counsel

of record.

_____/s/_____
Jacob A. Mercer
Assistant United States Attorney
