**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CASE NO.   1:26-CR-0008** |
| | : | **Hon. Anthony J. Trenga** |
| **SCOTT ALLEN BOLGER** | : | <u>**REDACTED**</u> |
| | : | |
| **Defendant.** | : | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

In accordance with this Court's policy regarding sentencing, Title 18 U.S.C. § 3553(a), and the remedial scheme set forth in *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005), Scott Allen Bolger, by counsel, respectfully submits his position on sentencing.

Based on the totality of the circumstances of the case, Mr. Bolger's background, and the mitigating factors set forth below, and applying the sentencing factors delineated in 18 U.S.C. § 3553(a), a sentence of time served followed by a term of supervised release is sufficient but not greater than necessary to meet the goals of sentencing.

### I.      <u>Procedural History</u>

On December 26, 2025, a two count Criminal Complaint was filed in this Court, charging Mr. Bolger with making an interstate threatening communication, in violation of 18 U.S.C. § 875(c), and false statements, in violation of 18 U.S.C. § 1001(a)(2).  Dkt. #1.  He was arrested on December 26, 2025 and had his initial appearance before Magistrate Judge William E. Fitzpatrick. Dkt. # 8, 9. On December 30, 2025, a preliminary hearing was held before Magistrate Judge William E. Fitzpatrick, and the Court found probable cause.  Dkt. # 15. The court also denied Mr. Bolger's motion for release, despite the recommendation in support of release by pretrial services,

1

and the magistrate court entered a detention order. *Id.*  Mr. Bolger filed a motion to revoke the detention order on January 5, 2026, and the motion was denied on January 6, 2026. Dkt. # 20, 23. Mr. Bolger appealed that Order to the Fourth Circuit on January 16, 2026, which subsequently affirmed the Order on February 19, 2026. Dkt. # 24, 50.  Mr. Bolger has therefore been in custody since December 26, 2025.

On January 15, 2026, the grand jury returned a one-count indictment charging Mr. Bolger with making an interstate threatening communication, in violation of 18 U.S.C. § 875(c).[1]  On January 22, 2026, Mr. Bolger was arraigned before the Honorable Anthony J. Trenga, at which time he entered a plea of not guilty and requested trial by jury. Dkt. # 34. Trial was scheduled for March 23, 2026. *Id.*  On February 11, 2026, Mr. Bolger filed a motion to suppress his statements, which were obtained without the benefit of *Miranda* warnings. Dkt. # 43-44.

On February 20, 2026, Mr. Bolger and the Government notified the Court of Mr. Bolger's anticipated change of plea.  On February 26, 2026, Mr. Bolger pled guilty to Count 1 of the indictment, pursuant to a Plea Agreement and Statement of Facts. Dkt. # 53-55.  The case now comes before the Court for imposition of sentence of June 3, 2026.

## II.      Introduction

On February 10, 2025, President Trump appointed Richard Grenell as "interim executive director" of the John F. Kennedy Center for the Arts, an iconic arts institution dedicated to the memory of President John F. Kennedy and a landmark in the nation's capital since 1971.  The Kennedy Center underwent dramatic changes to its board composition, leadership, and direction

---

[1] The grand jury declined to indict Mr. Bolger on the second charge of making false statements, in violation of 18 U.S.C. § 1001(a)(2).

over the ensuing months.  By December 18, 2025, the Kennedy Center was renamed at the direction of its new board members as the "Trump-Kennedy Center."

As a child, Scott Bolger first attended the "Stomp" show at the Kennedy Center, an experience that inspired his love of music.  Since then, he attended numerous concerts and plays at the Kennedy Center, a place he grew to love.  As a young biracial child, he also grew up with a deep admiration for the legacy of John F. Kennedy, who was a champion of civil rights. In short, Scott Bolger felt a deep connection to the Kennedy Center that transcended his passion for the arts.

In late December 2025, when Mr. Bolger learned that the board of the Kennedy Center had voted to rename it the "Trump-Kennedy Center," he was extremely upset.  He decided to contact the board to express his disapproval directly.  To that end, he searched for the contact information of the board members on Google, and he found a number for the interim director, Richard Grenell. On December 23, 2025, Mr. Bolger called the number from a Google voice-over-IP number, and, to his surprise, Mr. Grenell answered.  Mr. Bolger asked if this was Richard Grenell. Mr. Grenell asked back, "who is this?"  Mr. Bolger repeated his question, as did Mr. Grenell.  Mr. Grenell then called Mr. Bolger a "coward" and hung up the phone.

In a moment of anger that Mr. Bolger will regret for the rest of his life, he sent Mr. Grenell a single text message: "Step on U Street and get a bullet put between your eyes, loyalist pig skin p****."  At the time he sent this message, Mr. Bolger was in Virginia, and Mr. Grenell was in California.  Mr. Bolger immediately regretted sending the message, and he deleted it off his phone. He made no further attempted contact with Mr. Grenell, and he took no steps towards any kind of violence.

Mr. Grenell, who in addition to his role at the Kennedy Center is an Envoy for Special Missions, and a former Ambassador to Germany during President Trump's first term, immediately

contacted the FBI.  The FBI quickly and easily traced the Google phone number to Scott Bolger, and the very next day, on December 24, 2026, two FBI agents and a Fairfax County Police officer knocked on his apartment door.  They informed Mr. Bolger that they were investigating a threat. They asked for his name.  He responded, "I am sorry, I don't know what this is concerning." TFO Hariff stated that a person by the name of Scott sent a threatening message to a presidential appointee, and they asked if someone by that name lives at this address.  They also asked for his name.   Mr. Bolger responded: "I am sorry, I don't think I should answer questions without representation."   The agents told him this has nothing to do with him, telling him that if he cooperates with them, they can just check his name off.  Eventually, Mr. Bolger identified himself as "Brian Black."  The agents asked if they could look in his mailbox, and Mr. Bolger said no, again stating, "I am going to need representation before going forward."  TFO Hariff once again told him, "You're not under investigation," "we're not investigating you."  Mr. Bolger said "with everything going on today, this is weird.  Do you have a number I can call? I really don't want to do this right now. Do you have a card or anything?"  The agents responded that they did not have business cards. Mr. Bolger said: "I appreciate your time, thank you," and he walked back into his apartment.

The agents walked over to the leasing office, where they confirmed Mr. Bolger's identity. They returned to the apartment within minutes, and TFO Hariff confronted Mr. Bolger angrily, stating "You know what happened, okay, you just lied to a federal agent in front of the bodycam, you can be arrested and go to jail for five years, okay? We're here because you threatened somebody in D.C.  We're here to conduct an investigation and we want to know what happened. So you can come talk to us, or we can arrest you and charge you with it in federal court. What do you want to do?"  Mr. Bolger responded that he would speak with the agents.  TFO Hariff said,

"Right now you just lied to two federal agents, and I'm gonna call my attorney, get a fucking federal warrant for you and arrest you." Mr. Bolger said, "Please, I am really sorry . . I was going to," while TFO Hariff interjected, "'Brian Black' my ass." He spoke over Mr. Bolger as he tried to apologize, saying "no, no, no, the apologies are done. We're gonna do this. We're gonna. . . everyone is gonna calm down, bring the temperature down, we're gonna sit down, ask you a bunch of questions, ok. You don't have to say what you don't want to say." Mr. Bolger said: "I will tell the whole truth."

And he did. Mr. Bolger took full responsibility for his actions, described exactly what he had done, and repeatedly apologized for his conduct. The FBI 302 summarizing the interview reported: "BOLGER apologized several times and stated he was upset about the change of director at the Kennedy Center as that was a place he frequently visits for plays." The report further indicated: "BOLGER was remorseful and regretted sending the message to Mr. Grenell and meant no harm. BOLGER deleted the message as soon as he sent it."

In addition to accepting responsibility for the message to Mr. Grenell, Mr. Bolger during the same interview also accepted responsibility for having sent a series of harassing messages to an ex-girlfriend, P.L., between December 2022 to October 2023, following a bitter breakup. The FBI investigated those messages, which predated the message to Mr. Grenell by over two years. Through his Plea Agreement, and through his acceptance of responsibility statement in the Presentence Report, Mr. Bolger has continued on the same path of full acceptance of responsibility.

As the Court will see from reviewing the Presentence Report, Mr. Bolger has no prior criminal record. On the contrary, his background reflects a prosocial history of community involvement, volunteerism, church attendance, Eagle Scout accomplishments, and strong family support. Yet underneath the surface, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5

████████████████████████████████████████████████████████

██████████████████████████████████████████████ Those challenges went largely unaddressed, eventually contributing directly to his poor choices that now bring him before this Court as a convicted felon for life.

What is most notable about Scott Bolger, however, is how quickly and unequivocally he accepted responsibility for his actions. Just as importantly, he has worked sincerely since his arrest to make amends and to set himself up for success upon his release. As the Court will see from reviewing the record and the enclosed letters of support, Mr. Bolger has a number of protective factors and significant support from his family and loved ones, and he is eager to continue on the path of treatment and rehabilitation that he began after his arrest.

By the time of his sentencing hearing, Mr. Bolger will have served over five months in custody, a significant period for a man who has never previously served a day in jail. He has had to think about the consequences of his actions every day of those 159 days. Through his felony conviction, with all the attendant collateral consequences, and his incarceration to date and separation from his family, Mr. Bolger has been sufficiently punished for his conduct, and what he needs now above all is a sentence that is focused on rehabilitation and reintegration into the community as the kind of active, prosocial individual he has shown he can be.

### III.     Sentencing Guidelines

The Presentence Report ("PSR") calculates Mr. Bolger's base offense level as 12, assesses a 6-level victim-related adjustment based on the victim being a government "officer or employee," and applies a 3-level reduction for acceptance of responsibility. For the reasons that follow, Mr. Bolger respectfully objects to the assessment of the official victim enhancement, to the PSR's

6

failure to apply the zero-point offender adjustment, and to the PSR's failure to assess a 4-level reduction in his offense level for minimal deliberation, pursuant to U.S.S.G. § 2A6.1(b)(6).

### A. The Official Victim Enhancement, U.S.S.G. § 3A1.2, Does Not Apply.

Mr. Bolger objects to the Presentence Report's assessment of a 6-level adjustment pursuant to U.S.S.G. § 3A1.2, the "official victim" enhancement. That section provides:

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by **3** levels.

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels.

It is undisputed that Mr. Bolger's message to Mr. Grenell was not motivated by his status as former ambassador to Germany, or his position as envoy for special missions. Mr. Bolger was unaware of either of those positions, nor was his conduct motivated by either. Rather, the message he sent was motivated by his frustration at the renaming of the Kennedy Center and its restructuring by the current board, including Mr. Grenell. The "loyalist" reference in the text message was specifically motivated by Mr. Bolger's frustration with the renaming of the Kennedy Center as the "Trump Kennedy Center," a decision made by the board of directors of the Kennedy Center, of which Mr. Grenell was a member. As such, the relevant inquiry is whether Mr. Grenell, in his capacity as the "interim executive director" of the Kennedy Center, was a "government officer or employee."

While the PSR correctly notes that the Kennedy Center was created by Congress as a memorial to President John F. Kennedy and is a bureau within the Smithsonian Institution, upon closer scrutiny, it is apparent that Mr. Grenell was neither a "government officer" nor a "government employee" in his capacity as interim director of the Kennedy Center. The Kennedy

7

Center is a nonprofit institution managed and funded through a public-private partnership, and not all individuals serving in any capacity at the Center are automatically government "officers or employees."  Unlike government agencies, the Center is recognized as a charitable organization under IRS Section 501(c)(3) and is required to publicly file form 990 annually.[2]

The National Cultural Center Act of 1958, which authorized the establishment of the Kennedy Center, requires that its programming be sustained through private funds. *See* Title 20 U.S.C. Chapter 3, Subchapter V.  Through this public-private partnership, the government provided the land for the Center, while private contributions cover the majority of the Center's operating budget.[3]  *See* 20 U.S.C. § 76i ("The Board shall construct for the Smithsonian Institution, with funds raised by voluntary contributions. . . .").

In this unique public-private partnership, certain individuals are considered "employees" of the federal government, while others are not.  For example, in an advisory opinion published by the U.S. Office of Special Counsel on June 26, 2018 regarding the applicability of the Hatch Act to employees of the Kennedy Center, the Office of Special Counsel distinguished between the approximately 55 federal employees employed by the Center who are paid with federal funds and hold positions within the competitive service and "handle contracting project management, [and] facilities services and maintenance . . .," versus those who are paid by trust funds. Because those federal employees are paid with federal funds and are on the GSA scale, they are covered by the Hatch Act and subject to its restrictions.  On the other hand, the Office of Special Counsel concluded that the approximately 1,000 "trust employees" of the Kennedy Center, who are paid

---

[2]    *See*    https://projects.propublica.org/nonprofits/organizations/530245017.    *See    also* https://apps.irs.gov/app/eos/details/
[3] *See* https://www.kennedy-center.org/memorial/jfk/highlights/national-cultural-center/

with trust funds, are not federal employees and are thus not subject to the Hatch Act.[4]  Additionally, the National Cultural Center Act provides that trust employees of the Center are subject to the National Labor Relations Act, which specifically excludes the United States from its definition of an "employer."  *See* 20 U.S.C. § 76(k)(f)(2).  In contrast, federal employees are subject to the Federal Labor Relations Act.  *See* 5 U.S.C. § 7103.

In other words, the mechanics, plumbers, HVAC technicians, facilities managers, and others, who are employed and paid by the federal government and subject to the federal GSA pay scale, are federal "employees."  Based on publicly available information, it is apparent that executives and trustees of the Center are not.  Executive salaries at the Kennedy Center, including that of the director of the Center, do not appear to be paid by the federal government.  Rather, those substantial salaries are paid by the trust funds of the Center, which are funded by private contributions.  Public reporting by Forbes indicates that in tax years 2018 and 2019, the then-president of the Kennedy Center was earning a whopping $1.3 million in annual compensation, a figure that is clearly not tied to any federal pay scale.[5]  The Kennedy Center's publicly-filed IRS Form 990 disclosed that its President was paid over $1.4 million in 2024, while the executive director was paid over $353,000.[6]  Again, available records indicate these are not federal government salaries, and those are not "officers or employees" of the federal government.

When President Trump appointed Mr. Grenell as "interim executive director" of the Center in February 2025, he did so as part of a massive restructuring and gutting of the leadership structure of the Center at the time, simultaneous with the purge of previous board members and termination

---

[4] *See* https://www.governmentattic.org/39docs/OSCadvOpinHatchAct_2017-2019.pdf
[5]  *See* https://www.forbes.com/sites/adamandrzejewski/2021/01/31/kennedy-center-received-270-million-from-congress-and-paid-their-president-5-million-since-2016/
[6] *See* https://apps.irs.gov/pub/epostcard/cor/530245017_202409_990_2026012023848434.pdf

of the former President/CEO.  While public reporting indicates that Mr. Grenell took a massive pay cut from his predecessor's $1.4 million annual compensation, he does not appear to be paid on the standard federal GSA scale.[7]

Further, the language of the National Cultural Center Act itself suggests that not all individuals appointed by the President to serve at the Kennedy Center are necessarily "officers or employees" of the United States.  Title 20 U.S.C. § 76h, which addresses the procedure for the appointment of the Board of Trustees, provides:

> There shall be an Advisory Committee on the Arts composed of such members as the President of the United States may designate, to serve at the pleasure of the President. Persons appointed to the Advisory Committee on the Arts, ***including officers or employees of the United States***, shall be persons who are recognized for their knowledge of, or experience or interest in, one or more of the arts in the fields covered by the John F. Kennedy Center for the Performing Arts. (emphasis added).

The Act thus recognizes that the mere appointment of a member by the President does not automatically mean that individual is an "officer or employee" of the government.  Otherwise, the highlighted language above in § 76h would be mere surplusage.  *See Ross v. R.A. N. Dev., Inc. (In re Total Realty Mgmt., LLC)*, 706 F.3d 245, 251 (4th Cir. 2013) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplusage.") Nowhere in the National Cultural Center Act are the board members of the Kennedy Center classified as government "officers or employees."

Before a sentencing court can impose a Guidelines enhancement, the Government "must prove by a preponderance of the evidence that the enhancement applies." *United States v. Kobito*, 994 F.3d 696, 701 (4th Cir. 2021).  The Government has not provided any pay information

---

[7] *See* https://www.yahoo.com/news/articles/trump-kennedy-center-boss-accused-220827086.html

indicating that Mr. Grenell was ever paid as an official federal government employee or officer in his capacity as the interim director of the Kennedy Center. Accordingly, Mr. Bolger respectfully submits that despite the unique structure of the Kennedy Center and the President's role in selecting its interim director, Mr. Grenell does not qualify as a "government officer or employee" in his role as the interim director of the Kennedy Center, within the meaning of U.S.S.G. § 3A1.2.

Finally, Mr. Bolger's use of the term "loyalist" in the text message to Mr. Grenell is insufficient standing alone to trigger the official victim enhancement. This term can be used to describe any individual who supports the current administration, regardless of whether they are an officer or employee of the government. The PSR incorrectly concludes that the use of this term implies that Mr. Bolger "targeted him because of the positions he held under President Trump." As noted above, the only position of which Mr. Bolger was aware at the time was that of interim director of the Kennedy Center. Because Mr. Grenell was not an "officer or employee" of the government in his capacity as interim director of the Kennedy Center, it is immaterial whether Mr. Bolger was motivated by Mr. Grenell's role at the Kennedy Center for purposes of the § 3A1.2 adjustment, and that adjustment does not apply.

## B. Mr. Bolger Should be Granted a 4-Level Reduction Pursuant to U.S.S.G. § 2A6.1(b)(6).

Mr. Bolger also submits that a 4-level reduction in his offense level should be assessed pursuant to USSG § 2A6.1(b)(6), which states: "If (A) subsection (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply, and (B) the offense involved a single instance evidencing little or no deliberation, decrease by **4** levels." "Under that guideline subsection, a defendant convicted of making a threatening communication who did not engage in any conduct that would indicate an intent to carry out the threat, and whose offense involved only 'a single instance evidencing little

11

or no deliberation,' may be granted a four-level reduction in his base offense level." *United States v. Horton*, 98 F.3d 313, 319 (7th Cir. 1996).

Here, Mr. Bolger's base offense level, per the Plea Agreement and the PSR, is 12, pursuant to § 2A6.1(a)(1).  As such, subsection (a)(2) does not apply.  Second, none of the enhancements in subdivisions (1), (2), (3), (4), or (5) of subsection (b) apply.  Third, Mr. Bolger's offense conduct "involved a single instance evidencing little or no deliberation." While there does not appear to be controlling Fourth Circuit authority interpreting §2A6.1(b)(6), the Second Circuit has held that two factors should be considered in determining whether §2A6.1(b)(6) applies: "(1) whether, and under what circumstances, the threat itself has been repeated and (2) whether there is evidence of planning or some effort to carry out the threat." *United States v. Santos*, 801 F. App'x 814, 818 (2d Cir. 2020) (quoting *United States v. Wright-Darrisaw*, 781 F.3d 35, 41 (2d Cir. 2015)).

Mr. Bolger did not repeat the threat to Mr. Grenell. Nor did he engage in any planning or effort to carry out the threat.  He was upset at the renaming of the Kennedy Center, and he decided to call one of its board members to vent.  To his surprise, he reached Mr. Grenell, and after a brief back and forth of "is this Richard Grenell" and "who is this," Mr. Grenell insulted Mr. Bolger and hung up.  In a moment of anger at being insulted, Mr. Bolger sent a single threatening text message to Mr. Grenell.  In his interview with the FBI the next day, Mr. Bolger expressed remorse and regret for sending the message, stated that he meant no harm, stated that he owned no firearms and had no military training, and stated that he deleted the message to Mr. Grenell as soon as he had sent it.   His outburst was spontaneous and the result of his anger at being insulted during the brief call with Mr. Grenell, rather than the product of much deliberation.

The PSR incorrectly conflates Mr. Bolger's conduct leading up to the phone call to Mr. Grenell with the conduct leading up to the threatening message.  The PSR notes that Mr. Bolger

made the effort to search for Mr. Grenell's number, to call him, to ask if he had reached Mr. Grenell, and to use a Google voice account. Yet all of that conduct implies deliberation in his decision to *call* Mr. Grenell to vent about the renaming of the Kennedy Center. It does not indicate deliberation prior to sending the threatening message, an act that was a spontaneous and angry response to Mr. Grenell insulting him during the brief call. The "minimal deliberation" at issue in § 2A6.1(b)(6) is focused on the sending of the threatening communication, and the record here amply supports that there was little to no deliberation prior to that act. Moreover, there is no evidence of any plan to carry out the threat in any manner.

Accordingly, Mr. Bolger's offense conduct involved a single instance that evidenced little or no deliberation, and it falls squarely within the scope of § 2A6.1(b)(6). Therefore, a four-level reduction in his offense level should be applied.

### C. Mr. Bolger Qualifies for the Zero-Point Offender Adjustment, Pursuant to U.S.S.G. § 4C1.1.

Mr. Bolger objects to the PSR's determination that he does not qualify for a two-level decrease for Adjustment for Certain Zero-Point Offenders under USSG § 4C1.1, because "he used credible threats of violence in connection with the offense." First, Mr. Bolger's offense involved a single threatening text message, not multiple "threats."[8] Section 4C1.1's exclusionary language

---

[8] The messages to P.L. do not fall within the scope of relevant conduct under § 1B1.3, which defines "relevant conduct" for guidelines purposes as "(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; . . . *that occurred during the commission of the* **offense of conviction**, *in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense*; (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were *part of the same course of conduct or common scheme or plan as the offense of conviction*; (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and (4) any other information specified in the applicable guideline." *See also* U.S.S.G. § 1B1.3, Application Note 5.

expressly applies only to defendants who made multiple credible *threats* within their "relevant conduct."

Second, while the message to Mr. Grenell constituted a "threat" within the meaning of 18 USC § 875(c), the conviction offense, it did not constitute a "credible" threat.  Mr. Bolger had no means to act on the threat, took no steps in furtherance of it, had no contact with Mr. Grenell following that message, and immediately deleted it after sending it. Mr. Grenell was in California while Mr. Bolger was in Virginia at the time he sent the message. The language of the threat was conditional in nature, and it did not explicitly state that Mr. Bolger would carry out the threat. Additionally, FBI incident reports produced in discovery indicate that once agents interviewed Mr. Bolger the next day, on December 24, 2025, "[t]hrough the interview process, [the] threat was deemed mitigated."  Accordingly, Mr. Bolger did not use "credible threats of violence," and his subtotal offense level should therefore be reduced by two levels as a zero-point offender, pursuant to USSG § 4C1.1.

### D. Guidelines Calculation

Based upon the above, Mr. Bolger respectfully submits that his correct sentencing guidelines are as follows:

| Base Offense Level | USSG §2A6.1(a)(1) | 12 |
|---|---|---|
| Minimal deliberation | U.S.S.G. § 2A6.1(b)(6) | -4 |
| Acceptance of responsibility | USSG §3E1.1(a) | -2 |
| Adjustment for Zero-Point Offender | USSG § 4C1.1 | -2 |
| Total Offense Level | | = 4 |
| Guidelines Range | CHC I | = 0-6 months |

### IV.    <u>Legal Framework</u>

While this Court must correctly calculate the guideline range before imposing sentence, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or

14

presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242- 43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

Title 18 United States Code § 3553(a) sets forth the factors to be considered in imposing a sentence. Those factors support a sentence of time served, followed by a supervised release term.

**A. The Nature and Circumstances of the Offense and History and Characteristics of Mr. Bolger.**

Scott Bolger is a 33-year-old who comes before this Court for sentencing on the charge of making an interstate threat. The facts and circumstances of the offense conduct are set forth in detail in the PSR. While there is no question that Mr. Bolger's conduct is unacceptable and serious, it was limited in nature and did not involve any overt act towards any harm to others. He did not attempt to make any physical contact with Mr. Grenell, did not appear at his place of work, did not send any subsequent messages to him, nor did he do anything indicating an actual intent to cause harm. Moreover, there is no indication that Mr. Bolger ever had any ability to carry out the threat in any way; on the contrary, he does not possess any firearms and never took any steps towards acquiring any.

Additionally, while the harassing messages he sent to his ex-girlfriend are completely unacceptable, that conduct ended in late 2023, and, again, there is no evidence he attempted to contact her in person or to do anything beyond sending inappropriate messages through social

media.  What is more, the reason the Government first became aware of the messages sent by Mr. Bolger to his ex-girlfriend was Mr. Bolger's immediate and unequivocal acceptance of responsibility when he was questioned by the FBI on December 24, 2025: not only did he accept responsibility for the single message to Mr. Grenell, but he also disclosed that he had sent harassing messages to an ex-girlfriend.  And he repeatedly apologized and expressed remorse for his actions.

There is no question that Mr. Bolger's conduct, both in sending the text message to Mr. Grenell and the messages to his ex-girlfriend in 2022 and 2023, stands completely at odds with his personal characteristics, background, and character.  Mr. Bolger is a former Eagle Scout with no prior criminal record of any kind, a young man with strong community ties and family support, a graduate of Marshall University with a degree in journalism, and a member of the Society of Professional Journalists.  PSR, ¶ 62. In his youth, he was actively involved in extracurricular activities, including playing clarinet, acoustic guitar, and piano, participating in the marching band, in which he won many competitions, and playing on his school's basketball team.  PSR, ¶ 53.  In high school, he played football and joined the track team. *Id.* He also headed the Education Department for The Future Business Leaders of America.  *Id.*

He gained work experience during high school working on a farm in West Virginia during the summer, in addition to working for a landscape business, where he helped maintain a historical property in Charles Town, West Virginia. Over several years, he volunteered his time on special projects, such as "Adopt A Highway," in addition to helping his family collect food for the homeless during holidays, a Bolger family tradition. PSR, ¶ 53.  During the summers while in high school and his early years in college, he volunteered and worked with Jefferson County softball and baseball Leagues, where he umpired games. *Id.*

In college, he volunteered his time to the Marshall University school newspaper, traveling and covering sports stories and special highlights on athletes. PSR, ¶ 53.  He also received multiple scholarships, including the James A. Tolbert Scholarship, the EE Baltimore Memorial Scholarship, the Dr. Martin Luther King, Jr. Scholarship, the 2010 AIM-IRS Academic Achievement Scholarship, and the Terry Lee Walker, Jr. Scholarship. PSR, ¶ 62. Mr. Bolger was also actively involved in his local church along with his family. PSR, ¶ 53. He volunteered with the church's service team and served with the Habitat for Humanity Team, where he helped build pathways and patio ramps for wheelchair-bound youth and adults. *Id.* These accolades and many years of community involvement and service, along with his spotless criminal record and strong family support, all indicate that Mr. Bolger has led a charitable and community-involved life prior to the conduct that now brings him before this Court for sentencing.

Yet despite this seemingly picture-perfect background, Mr. Bolger had been quietly struggling for years leading up to his arrest in 2025.  As the PSR indicates, ███████████████



Despite these challenges, Mr. Bolger ultimately graduated from college with a journalism degree and obtained employment as a digital marketer at a recruiting agency. PSR, ¶ 62. He then accepted a job at American Credit Unions, where he was employed from 2020 to 2024. PSR, ¶ 65. But in 2024, due to restructuring, he was laid off. *Id.* He tried repeatedly to find other employment, but without success. After months of applications without progress, he decided to start doing contract work as a digital marketer on his own. PSR, ¶ 64. However, the revenue he earned was not enough, and he was struggling financially from the time of his termination in 2024 and leading to the date of his arrest.

There is no doubt that ███████████████████████████████ ███████████████ all contributed directly to his poor judgment and to the outbursts that have now brought him before this Court as a convicted felon. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

19



Notably, Mr. Bolger has not waited for his release to begin working on self-betterment and preparing for his return to the community. In addition to the forensic mental health evaluation by Dr. Robinson, Mr. Bolger also completed an anger management program with George Young, a Licensed Clinical Social Worker and Master Addiction counselor.

Mr. Bolger's conduct since his arrest reflects a sincere commitment to rehabilitation and to turning his life around.  As the PSR indicates, "Mr. Bolger attended anger management classes when they were offered and regularly attends Discipleship Study every Saturday. He also completed self-study, specifically a program called: 'How to Escape your Prison: Moral Recognition Therapy.' Mr. Bolger is regularly observed interacting with his peers and participating in activities. Mr. Bolger has received no major or minor violations while incarcerated. He has adjusted appropriately throughout his time in jail." PSR, ¶ 10.

Throughout his incarceration, Mr. Bolger also completed at least 28 courses, including the 12-Step Recovery Program, A Student Guide to Drug and Alcohol Abuse, Adapting to Change, Anger Management, Basic Spanish Skills, Business Communication, Bystander Intervention Training, and many more.  Exhibit 3 (collection of course certificates).  These rehabilitative steps taken by Mr. Bolger while in custody indicate that he recognizes the need to change the course he was on, to turn a new leaf upon his release, and to continue availing himself of every opportunity to do better going forward.

To be clear, there is no question that the charge that brings Mr. Bolger before this Court is serious.  However, in determining an appropriate sentence the Court must also consider Mr. Bolger's history and background, the mitigating evidence, ███████████████████ ███████████████████████████████████████.  Those are not excuses for his conduct, for which he must accept—and has accepted—full responsibility. Mr. Bolger's acceptance of responsibility statement in the PSR demonstrates that he understands the gravity of his situation, and that he is committed to turning his life around.

And in that pursuit, Mr. Bolger will not be alone. He is fortunate to have the unwavering love and support of his family and friends, who have written heartfelt letters of support to this

Court on behalf of Mr. Bolger. *See* Exhibit 4 (collection of letters of support). Those letters are significant not just for their quantity, but more importantly their quality and the quality of those who wrote in his support. They describe Mr. Bolger as "thoughtful, compassionate, vulnerable, flawed, and a good person." He is "very respectful, friendly, and approachable," "loyal and devoted to his parents," "always ready to lend a hand," and someone with "an authentic intellectual curiosity regarding the world around him."

These letters show the Court who the real Scott Bolger is, who is much more than the sum of his offense conduct. He is a devoted son, a hard worker, and a gentle and kind man with significant community support. Just as importantly, these letters indicate that upon his release, Mr. Bolger will stand to benefit from the support of his family and community, as well as the programs and services that will be made available to him to guide him on the path of rehabilitation.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

A sentence of time served, followed by a term of supervised release, properly accounts for the limited nature of the offense conduct, while simultaneously meeting the goals of sentencing and promoting respect for the law. Mr. Bolger's full and early acceptance of responsibility █████ ████████████████████████████████████████ support that a harsher sentence is not needed to reflect the seriousness of the offense or promote respect for the law.

For someone without any prior criminal record, the felony conviction in this case is itself, over the course of Mr. Bolger's life, far greater punishment than any sentence the Court may impose. The myriad laws, rules, and regulations that operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy were poignantly described by Judge Frederick Block of the Eastern District of New York as "a form of 'civi[l] death' that send[s] the unequivocal message that 'they' are no longer part of 'us.'" *United*

*States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016). The barriers raised by ever-expanding collateral consequences, branding so many millions with the "Mark of Cain" also carry with them new and potent deterrent effect.[9] The challenges that convicted felons face, ranging from losing their civil rights to difficulty with finding gainful employment, are all significant additional punishments that Mr. Bolger will endure.

What is more, the publicity surrounding Mr. Bolger's arrest and conviction will make it that much more difficult for him to recover his reputation following his release, no matter how much remorse he expresses and how hard he works to make amends. Following Mr. Bolger's arrest, Richard Grenell, who has over 1.8 million followers on X (formerly Twitter), posted a link to the Fox News article on Mr. Bolger's detention along with the following message: "I am grateful to Pam Bondi, Kash Patel and Lindsey Halligan for finding this deranged individual and locking him up. His name is Scott Bolger." *See* Exhibit 5. Any internet search for Scott Bolger will be forever associated with his arrest and prosecution.

Moreover, the term of supervised release that Mr. Bolger will serve is an additional punishment. "Supervised release is punishment; it is a deprivation of some portion of one's liberty imposed as a punitive measure for a bad act. A defendant on supervised release is subject to various terms and conditions which restrict his freedom and make him vulnerable to further punishment should he violate them. Such subsequent punishment may again include more imprisonment and more supervised release." *United States v. Dozier*, 119 F.3d 239, 242 (3d Cir. 1997). The Supreme Court has also recognized in *United States v. Gall*, 552 U.S. 38, 48 (2007) that supervised release is punitive. Individuals on supervision are "subject to several standard conditions that substantially

---

[9] There are approximately 45,000 laws and rules in U.S. jurisdictions that restrict opportunities and benefits in one way or another based upon a conviction. *Nat'l Inventory of the Collateral Consequences of Conviction*, available at http://www.abacollateralconsequences.org.

restrict their liberty." *Id.* "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001).

### C. The Need to Afford Adequate Deterrence to Criminal Conduct, to Protect the Public From Further Crimes of the Defendant, and to Avoid Unwarranted Disparities.

The requested sentence also provides adequate individual and general deterrence against committing future offenses. Through his immediate acceptance of responsibility, and his sincere expression of remorse for his conduct, Mr. Bolger has shown that additional punishment is not necessary to deter future conduct or to protect the public.

Additionally, this is not a defendant who has ever served any period of incarceration; this is a young man who has never previously faced the loss of his liberty and who has now been detained without bail for over five months. A defendant like Mr. Bolger who has never previously been incarcerated might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *United States v. Mishoe*, 241 F.3d 214, 220, (2d. Cir. 2001). The reality is that lengthier incarceration in the face of mental health and substance abuse challenges is not particularly effective. Congress itself has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a).

Mr. Bolger's conduct since his arrest indicates he is unlikely to recidivate after completing his sentence. He has adjusted well at the jail and enrolled in substance abuse classes, anger management counseling, and other courses offered at the jail, reflecting his good behavior and desire to do well under the difficult circumstances he is currently in.

Further, a sentence of time-served followed by supervised release would avoid unwarranted disparities with similarly situated defendants. A review of the dispositions in other 18 U.S.C. § 875(c) cases supports that a sentence of time served followed by supervised release would avoid unwarranted disparities:

- *United States v. Aaditya Chand*, 5:24-CR-491 (N.D. Ca. 2025): The defendant was charged with two counts of violating 18 U.S.C. § 875(c) after sending direct messages to a U.S. Congressperson stating "I'm gonna shoot up ur office tomorrow u Palestinian scum," "Get ready," and "I'm gonna bring a gun to ur office tomorrow and shoot u and ur staff." On August 6, 2025, the Government entered into an agreement for pretrial diversion for a period of just 90 days, in which the defendant performed community service, completed anger management, and received mental health counseling.  On November 3, 2025, his charges were dismissed on the Government's motion.

- *United States v. Samuel Cundari*, 3:24-cr-30021 (C.D. Ill. 2026): The defendant, a former assistant state's attorney, was charged under § 875(c) after sending threats to two Illinois State Representatives stating, "Our patience grows short with you. The day we put your kids' feet first into a woodchipper so we can enjoy their last few screams is coming," and posting, "I sure hope NOBODY leaves a pressure cooker filled with ball bearings, glass, and nails, filled with diesel fuel and fertilizer, with the over pressure safety valve disabled, near a natural gas line line [sic]." He was sentenced on February 25, 2026 to 12 months of home confinement and 36 months of supervised release.

- *United States v. Deep Alpesh Kumar Patel*, 8:23-CR-432 (M.D. Fl. 2023): The defendant was convicted under § 875(c) for sending a threatening voicemail to the World Jewish Congress stating: "I want to let you guys know, fuck all of you. Fuck all of you Israelis.

Fuck all of you, every single one of you. I wish you guys go to hell. I do not want anything from you guys nothing, I just want you guys to go to fucking hell. You guys deserve it. FUCKING HELL! Fucking don't deserve nothing, not one thing from THIS FUCKIN WORLD! GO TO FUCKIN HELL! FUCK YOU GUYS! FUCK YOU! If I had a chance I would kill every single one of you Israelis. EVERY SINGLE ONE OF YOU! Cause mass genocide of every single Israeli, FUCK YOU! FUCK ALL OF YOU ISRAELIS, EVERY SINGLE ONE OF YOU, COCK SUCKING MOTHER FUCKERS! Thank you." Minutes later, he called a synagogue and made a threatening recorded voicemail message that was replete with antisemitic statements and expletives. He was sentenced to a term of 6 months followed by 3 years of supervised release.

- *United States v. Massimo Frangella*, 1:24-cr-99 (D. Maine 2025): The defendant pled guilty to sending interstate threats after he sent seven threatening emails to Maine public officials with a subject line of "You're going to die." In the body of the emails he threatened: ""I'm going to kill you and all of your child raping friends." He was sentenced to 6 months, followed by 3 years of supervised release.

- *United States v. Benjamin Brown*, 1:24-cr-45 (D. Maine 2025): The defendant pled guilty to making interstate threats after posting comments on YouTube threatening to hunt down and kill illegal immigrants, stating no one could stop him from killing them, not even law enforcement.  Notably, federal agents had already met with Brown twice before to discuss other comments he had posted online and warning him about making interstate threats, yet he persisted.  He was sentenced to time served, which was approximately 6 months.

- *United States v. Jacob Buckley*, 4:25-cr-200 (2026): The defendant pled guilty to making threats against then-president-elect Donald Trump, including threatening to kill him. He

26

posted publicly: "I hate MAGA republicans bro on god I'll kill all of them"; "I'm going to kill Trump"; and, "Bro we going into a literal oligarchy in 4 days and im going to kill Trump." He was sentenced to a one-year term of probation.

- *United States v. Chain*, 1:18-cr-10322 (D. Mass. 2019): Chain pleaded guilty to seven counts of making interstate threats after he made approximately 14 threatening phone calls to the Boston Globe's newsroom, in which he threatened to shoot Globe employees in the head, "later today, at 4 o'clock," resulting in an immediate law enforcement response to protect the safety of the Globe employees. He also threatened reporters at the New York Times, leaving messages filled with racial slurs and threats to rape and kill them or their relatives. He was sentenced to serve a total of four months.

- *United States v. Joseph Morelli*, 3:22-cr-115 (N.D. N.Y. 2023): The defendant pleaded guilty to three counts of making interstate threats after he made several calls to the office of Congresswoman Marjorie Taylor Greene, in which he stated: "I'm gonna have to take your life into my own hands. . . I'm gonna hurt you. Physically, I'm gonna harm you." He left a second message threatening to "pay someone 500 bucks to take a baseball bat and crack your skull." He was sentenced to three months in prison on each count to run concurrently.

And there are many other examples of cases with far more egregious and repeated conduct, including by defendants with prior criminal records, where the sentences imposed are far less than what the Government seeks in this case. Mr. Bolger's conduct, personal character, and history all support that any sentence beyond time served would result in unwarranted sentencing disparities with similarly situated, and more culpable, defendants.

27

Further, in considering disparities in sentencing, it is important to also acknowledge not just conduct that has resulted in sentencing in other cases, but also politically-violent rhetoric that has gone unpunished by the Government, including that of President Trump, who has made many threatening and violent statements against his political opponents without facing any criminal prosecution:

- Shortly before the November 2024 election, he said that former Representative Liz Cheney should have guns "trained on her face."[10] "Let's put her with a rifle standing there with nine barrels shooting at her, okay? Let's see how she feels . . . when the guns are trained on her face," he said.

- He suggested in a Truth Social post that Former Chairman of the Joint Chiefs of Staff Mark Milley should be put to death, writing that Milley's phone call to reassure China in the aftermath of the January 6, 2021 storming of the Capitol was "an act so egregious that, in times gone by, the punishment would have been DEATH."[11]

- At a 2016 rally, Trump told the crowd: "if you see somebody getting ready to throw a tomato, knock the crap out of 'em, would you? Seriously," he said to cheers from the audience. "Just knock the hell — I promise you, I will pay for the legal fees. I promise. I promise. It won't be so much because the courts agree with us, too."[12]

- During a February 22, 2016 rally, President Trump said, "I'd like to punch him in the face" in response to a protestor who interrupted a Las Vegas rally.[13]

---

[10]     https://www.theatlantic.com/politics/archive/2024/11/trump-liz-cheney-war/680485/
[11]       https://www.theatlantic.com/ideas/archive/2023/09/trump-milley-execution-incitement-violence/675435/
[12]    https://www.politico.com/blogs/iowa-caucus-2016-live-updates/2016/02/donald-trump-iowa-rally-tomatoes-218546
[13]   https://www.theatlantic.com/politics/archive/2024/10/trump-violent-rhetoric-timeline/680403/

- During President Trump's speech on January 6, 2021, he encouraged attendees to "fight like hell" and march to the Capitol. All criminal charges arising from that incident against President Trump were dismissed.

- In 2023, President Trump posted on Truth Social warning of "potential death and destruction" if he were criminally charged.[14]

- On March 16, 2024, during a speech in Ohio, President Trump said: "If I don't get elected . . . it's going to be a bloodbath for the country. . . that's going to be the least of it."[15]

Additionally, in some threats cases the Government has chosen not to prosecute a felony charge despite far more aggravating circumstances than those in this case. For example, Christopher Moynihan, who was convicted and sentenced to 21 months in prison for his role in breaking into the Capitol during the January 6, 2021 insurrection and was later pardoned by President Trump, threatened to kill House Minority Leader Hakeem Jeffries, writing: "I will kill him for the future." He was not prosecuted by federal officials and instead pleaded guilty to a misdemeanor state harassment charge, ultimately receiving a sentence of three years of probation.[16]

While every case is unique, and sentencing is an individual judgment, the Government's charging decisions and sentencing recommendations raise serious questions about whether the law is applied equally to those who support and those who oppose the President. Simply put, the Government's sentencing recommendation, and the motivations behind that recommendation,

---

[14] https://www.nbcnews.com/politics/donald-trump/trump-warns-potential-death-destruction-charged-hush-money-probe-rcna76500
[15] https://www.theatlantic.com/politics/archive/2024/10/trump-violent-rhetoric-timeline/680403/
[16] https://www.timesunion.com/hudsonvalley/news/article/christopher-moynihan-pleads-guilty-hakeem-jeffries-21338274.php

must be taken with a grain of salt.

### D.  The Need for Rehabilitation and Correctional Treatment.

As discussed above and documented in both the PSR and Dr. Robinson's report, ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  The sentence imposed here must be targeted

at rehabilitation, treatment, and a path towards a sober and positive future, and the type of long-

term rehabilitation needed here is simply not offered by the BOP.  The resources needed for such

rehabilitation will be available through the Special Conditions of supervised release that are better

suited to accomplishing rehabilitation.

### V.    Conclusion

For the foregoing reasons, Scott Bolger respectfully submits that a sentence of time served,

followed by a term of supervised release, should be imposed.

Respectfully Submitted,
Scott Allen Bolger
By Counsel


ELSAYED LAW PLLC


BY: _____/s/_____
     Muhammad Elsayed
     Virginia Bar No. 86151
     3955 Chain Bridge Road
     Second Floor
     Fairfax, Virginia 22030
     (703) 884-2636
     (703) 884-2637 (fax)
     me@elsayedlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing pleading was filed on ECF,

which sent electronic copies to all counsel of record.

\_\_\_\_/s/_____
Muhammad Elsayed
Virginia Bar No. 86151
3955 Chain Bridge Road
Second Floor
Fairfax, Virginia 22030
(703) 884-2636
(703) 884-2637 (fax)
me@elsayedlaw.com

31